248 So.2d 768

**Aaron Inman CHATHAM, Jr.**

v.

**STATE.**

1 Div. 126.

Court of Criminal Appeals of Alabama.

May 25, 1971.

Thomas M. Haas and J. D. Quinlivan, Jr., Mobile, for petitioner.

MacDonald Gallion, Atty. Gen., and Jasper B. Roberts, Asst. Atty. Gen., for the State.

ALMON, Judge.

Appellant was arrested under a Governor's warrant issued by the Governor of Alabama on the requisition of the Governor of Mississippi. This warrant recited that appellant was charged by indictment in the County of Jackson, Mississippi, with the crime of embezzlement.

Appellant filed a petition for a writ of habeas corpus seeking his discharge from the custody of the Sheriff of Mobile County. He contends that extradition is sought directly or indirectly to aid in the collection of a debt. From a judgment of the circuit court denying his discharge, he brings this appeal.

Tit. 15, § 68, Code of Alabama, 1940, reads as follows:

"Nothing in this chapter shall be construed as authorizing the extradition of

any person in this state to any other state where the extradition proceedings, directly or indirectly, seek to aid in the collection of any debt, demand or claim against the party sought to be extradited."

The evidence tended to show that appellant was employed as superintendent of construction for Millette and Associates, a corporation, in Pascagoula, Mississippi. This corporation was solely owned by Ted Millette, a member of the State Legislature of Mississippi, and his two brothers. Appellant had been working approximately one year in that capacity when he disappeared in February of 1970, apparently moving to Mobile, Alabama.

Appellant's employment arrangement was rather informal. Their agreement was not in writing and appellant received approximately $300.00 each week, depending upon the success of their various business ventures. He had authority to sign his own pay check but it had to be co-signed by one of the Millette brothers. It is difficult to glean from the record the exact cause of their differences and appellant's subsequent departure.

Some "two or three or four weeks" after the appellant left Mississippi, Thomas Millette swore out the following complaint:

"The State of Mississippi      No. 55983
Jackson County
City of Pascagoula

"Before me, the undersigned Court Clerk of the City of Pascagoula, personally appeared Thomas S. Millette who makes affidavit that Aaron Chatham on or about the 23 day of Feb., 1970, did violate Ordinance No. 26–1946, to-wit: did willfully, unlawfully and feloniously with intent misappropriate and embezzle funds in the amount of $1764.54 and deposited to defendant's personal account Pascagoula Moss Point on January 26, 1970, said funds owned by Ted J. Millette and Aaron Chatham for repair work done on house 406 Larchmont St., Pascagoula, Miss., against the peace and dignity of the City of Pascagoula and State of Mississippi.

"Thomas S. Millette

"Sworn to and subscribed before me, this 23 day of Feb., 1970.

"V. F. Thornton
Clerk of Court"

Around February or March, 1970, the three Millette brothers drove to Mobile and had a conversation with appellant. According to the testimony, appellant had taken with him some of the corporation's business records, contracts, etc., when he left Mississippi. The tenor of that conversation is reflected by Ted Millette's testimony as follows:

"Q. What conversation, if any, did you have with Aaron Chatham on that occasion?

"A. Well, we told him that we were in a bind with the Evans' job over in Gulfport because we didn't have a contract on it and that our books showed that he had paid some forty-two hundred dollars and the original contract was around seventeen thousand five hundred and we wanted to know exactly how much extras we had done on the job to bill him for and if it was so that—did he take some— did he receive a check from Mr. Evans, who is his cousin, and deposit it to his own account which he said he did.

"Q. What other conversation did you have with him?

"A. And we told him that we sure needed his help with the Evans to see exactly what needed to be completed and we also needed to know how much Mr. Evans owed us.

"Q. Any other conversation?

"A. And, of course, we were in the same position with the Rooker (phonetic)

job. We did about, if I remember correctly, around thirteen thousand dollars on the Rooker house and we were about three-quarters through and we didn't have the contract on it and we didn't know exactly how much Rooker had paid us.

"Q. Well, were you talking about this, I'm asking about * * *

"A. Yes sir, we were telling him that we were in bad shape, we needed some help from him.

"Q. All right, what other conversation did you have?

"A. And we asked him if he could give us some money or rather give us the seventeen hundred, whatever that check was, if he could repay us that because our books should show that we had spent some fifteen or sixteen hundred dollars of our money repairing the house.

"Q. Any further conversation at that time?

"A. I can't recall any.

"Q. Now Mr. Millette, you knew that a warrant had been issued for the arrest of Mr. Chatham when you came over here, didn't you?

"A. Yes sir.

"Q. Are you saying that you didn't discuss that with him?

"A. Yes sir, we told him about it.

"Q. Well, what conversation * * *

"A. I think, I think. I can't recall to tell you the truth.

"Q. Well, what conversation did you have with him about that?

"A. We had sort of agreed, he had agreed that he would come back over and straighten out these several jobs that we had and bring us the contracts that he had taken from the office to tell us exactly

how much we had to do on the house, whether we had to paint the outside and the inside and what rooms we had to repair and so forth.

"Q. Well, what conversation did you have with him about this warrant for his arrest?

"A. I just—I think he was aware of the fact that a warrant had been issued and he asked about it and I—and we told him yes.

"Q. And that, you say that's the extent of the conversation?

"A. That's all I can recall, let me say that.

"Q. Did you say anything about what was going to happen to that warrant if he did cooperate with you and come back and straighten these things out?

"A. I don't recall whether we said that or not, no sir.

"Q. You could have but you don't remember, is that it?

"A. I would say off-hand, that if we discussed this, we discussed—we talked for several, oh, I'd say 20–30 minutes, that we certainly don't want to see criminal action brought against Mr. Chatham. We don't have any bad feelings between us like that. We, of course, wanted to get the money that was due us and we certainly needed it to find out where we were in several jobs."

Earlier in the testimony of Ted Millette the following occurred:

"MR. HAAS: The question is, if at any time one month or more, before February the 23, 1970, you or to your knowledge your brothers attempted to collect any money from Aaron Chatham?

"A. I know what you mean. Yes, we asked him where the seventeen or

eighteen hundred dollar check was, that was due the company.

"Q. All right sir. When did you ask him that?

"A. I don't recall exactly when. I'm sorry I can't answer the question."

There was other evidence tending to show that appellant did not have any money and had filed bankruptcy proceedings shortly before the hearing on his petition for habeas corpus.

But upon the whole of the evidence we are compelled to the conclusion that this extradition was sought either directly or indirectly to aid in the collection of a debt demand or claim against the party sought to be extradited and falls within the inhibition of Sec. 68, supra.

This court in Scott v. State, 33 Ala.App. 328, 33 So.2d 390, stated:

"The language of Section 68, Title 15, of the Code of Alabama of 1940, is clear and explicit. It was passed to preserve and protect the real purpose of rendition statutes, and to protect the process from the evils and private uses to which it was exposed. The legislative intent is clear from the language of the statute. There is no word in it of doubtful import. It is broad in its application, and emphatic in its prohibition. The following underlined words of the statute are all inclusive. They clearly reveal that the Legislature meant this prohibition to have a broad application, to be liberally construed."

See also Stubblefield v. State, 35 Ala. App. 419, 47 So.2d 662; King v. State, 36 Ala.App. 368, 56 So.2d 379; and Harris v. State, 38 Ala.App. 284, 82 So.2d 439.

The judgment of the trial court is reversed and a judgment is here rendered discharging the appellant.

Reversed and rendered.